Jose R. ALVAREZ–FONSECA,
Plaintiff–Appellant,

v.

PEPSI COLA OF PUERTO RICO
BOTTLING COMPANY,
Defendant–Appellee.

No. 97–2229.

United States Court of Appeals,
First Circuit.

Heard Feb. 24, 1998.

Decided Aug. 5, 1998.

Juan Rafael González–Muñoz, with whom González–Muñoz & Quiñones–Tridas was on brief for appellant.

Graciela J. Belaval, with whom Martínez, Odell & Calabria was on brief for appellee.

Before TORRUELLA, Chief Judge, CAMPBELL, Senior Circuit Judge, and SELYA, Circuit Judge.

TORRUELLA, Chief Judge.

Plaintiff-appellant José R. Alvarez–Fonseca sued his former employer, defendant-appellee Pepsi Cola of Puerto Rico Bottling Company, under the Age Discrimination in Employment Act of 1967 ("ADEA"), as amended, 29 U.S.C. § 621–34 (1985 & Supp. 1996), and the Puerto Rico Anti–Discrimination Act (also known as Law 100), P.R. Laws Ann. tit. 29, §§ 146, alleging that he was fired because of his age. After trial, the jury returned a verdict for Alvarez on both claims. The district court, however, granted Pepsi's renewed motion for judgment as a matter of law, set aside the jury's verdict, and entered judgment dismissing the complaint. We affirm.

## I. Background

Early in the workday on October 13, 1993, Alvarez got into a fist-fight with another employee. Alvarez was eventually discharged. The fundamental question in this case is whether Alvarez was fired because of his age, or because of his involvement in the fight. We recite the underlying facts in the light most favorable to the jury's verdict. *See Gibson v. City of Cranston,* 37 F.3d 731, 735 (1st Cir.1994).

Alvarez, the plaintiff, worked for Pepsi for thirty-four years, having been hired on October 2, 1959, at the age of 20, and rising ultimately to the position of Production Line Supervisor of the canning line. At the time of the incident that gave rise to this case, Alvarez was 54 years old, and the oldest of the four production supervisors. During the years that he worked for Pepsi, Alvarez performed his duties in a satisfactory manner. However, Alvarez was also known for his temper tantrums at work, commonly used obscene language there, and had been involved in at least two other fights at the plant.

Alvarez reported to work at 5:00 A.M. on October 13, 1993. It was his first day of work after a two-week vacation, and he soon discovered that there were various problems that required his attention. When the production line started, he noticed that the packing machine, which forms cardboard cartons that hold cans of Pepsi Cola, was producing defective cartons. He concluded that the cardboard being used was of sub-standard quality. He was also short one employee, who was absent without explanation. Alvarez became upset at finding matters in such disarray upon his return from vacation. Some time afterwards, Alvarez spoke with Wilfredo Cordero, the Materials Manager,[1] to complain in uncouth, expletive-rich language about the management style of José Almeida, the Production Manager, who had been Alvarez's immediate superior since 1979.

Around 7:00 A.M., Alvarez crawled under the packing machine to remove some cardboard from it. Around 7:30 A.M., Almeida arrived on the premises. When he noticed that Alvarez was operating the machine, Almeida reprimanded him for doing so, reminding Alvarez that company procedure indicated that supervisors should not perform such work. Alvarez explained that he had to operate the machine because he was short one employee and the operator was in the bathroom. Almeida responded, however, by pointing out that during Alvarez's vacation, the work had been performed by one opera-

---

1. Cordero was 39 at the time, had worked with Pepsi since he was 16 years old, and in that time had never been involved in a violent incident at work.

tor, without a supervisor, which suggested that supervisors did not need to operate the machines. Alvarez retorted that Almeida's failure to supervise effectively was precisely the reason why the production line had continued to use inferior quality cardboard.

Shortly, thereafter, when Cordero approached Alvarez, the latter complained to him that there was a problem with the quality of the cardboard, and pointed to the pile of defective cartons that had been produced that morning. As Materials Manager, Cordero was in charge of purchasing cardboard for use in the packing machine. An argument ensued, and Cordero told Alvarez that he was senile. Alvarez responded by throwing a piece of cardboard at Cordero, which hit him on the chest, and telling Cordero to see whether the piece of cardboard was any good. The argument escalated, and Cordero told Alvarez that he was ill-bred and belligerent. Cordero also said that he would figure out a way to have Alvarez fired. The Production Manager, Almeida, returned at that point and, after asking what was going on, told Alvarez to just go home, noting that he was getting into an argument, as usual. Cordero then asked Almeida to talk to the Plant Manager, David Cuthberson, to have Alvarez fired.

The argument became physical at that point, and other Pepsi employees intervened to attempt to break up the altercation. Alvarez threw an object at Cordero, which struck him on the face and made his lower lip bleed. Alvarez and Cordero fell to the floor in the course of pushing and shoving each other. Cordero tried to overcome Alvarez, but was restrained by other employees. While Cordero was being held by others, Alvarez punched him on the forehead. Finally, a security guard arrived and ordered both Alvarez and Cordero to leave the premises immediately.

Pursuant to Pepsi procedures, Almeida immediately prepared a contact sheet that documented the incident. He wrote that Alvarez had demonstrated "aggressive conduct against a fellow worker without considering the consequences caused by his conduct, that he was engaged in a fight."

Pepsi conducted an investigation of the incident. On October 16, 1993, the Personnel Director, Vanessa Boneta, held a meeting with both Alvarez and Cordero, and asked them to present their versions of what had happened. Alvarez admitted having provoked the incident, asked Cordero for forgiveness, and stated that he felt "repentant and sad for what [he] had done." Boneta advised Alvarez that he could be fired or suspended for his conduct. Pursuant to its workplace safety rules, Pepsi reserved its right to suspend or fire an employee who instigated a fight, threatened others with aggression, or became involved in physical horseplay. Alvarez admits that he has been involved in several violent episodes at work over the years, explaining that it is sometimes necessary to use force in order to maintain discipline.

After the meeting, Cordero was suspended without pay for thirty days, but no further disciplinary action was taken against him. At the end of the thirty-day period, he returned to work as Materials Manager. Alvarez, however, was suspended for sixty days. He admits that he could have been fired, but notes that Pepsi chose merely to suspend him, in consideration of the many years that he had worked there. It was the first time that he had ever been suspended from work.

During the suspension period, Alvarez became depressed, nervous, and his blood pressure, which had risen dangerously before his vacation, rose again. He thus sought treatment from the State Insurance Fund. His condition improved some time soon after the sixty-day period ended, and he received a medical certificate stating that he was able to work, although he continued under the supervision of the State Insurance Fund. He reported to work in early January 1994, but although Pepsi then renewed payment of his salary, Boneta told him that he could not start working again until he had obtained another medical certificate, this time from a physician designated by Pepsi. He complied with this request, and returned with the second certificate on January 11, 1994. Boneta, however, instructed Alvarez to return home and wait until further notice from Pepsi.

For the next few weeks, Alvarez and Boneta remained in contact, but nothing concrete resulted either from Boneta's calls to Alvarez, or from Alvarez's visits to her office. In February 1994, Alvarez met with Boneta and the Plant Manager, David Cuthberson. At that meeting, Alvarez was offered an early retirement plan. According to the offer, Pepsi would continue to pay his salary until December 31, 1994, if he agreed to retire early, on May 15, 1994, the date of his 55th birthday.[2] The company would process his early retirement on that date, and permit him to liquidate his accumulated vacation pay. The following month, in addition to his regular salary, he would begin to collect a pension payment of $392.39 per month for the rest of his life.

Alvarez, however, rejected the offer. Instead, he and his attorney submitted a counterproposal for early retirement. Upon receipt of this proposal, Pepsi ordered a new investigation of the October 13, 1993, incident. Alvarez refused to participate in the new investigation.

Nothing else happened until August 8, 1994, when the State Insurance Fund released him, having concluded that his condition was not related to work. Later that month, Pepsi's payroll records were changed to reflect Alvarez's separation from Pepsi, and Pepsi stopped paying Alvarez his salary. Alvarez never tendered his resignation to Pepsi, nor did Pepsi give him notice that he had been discharged.

On August 16, 1995, Alvarez filed the instant suit against Pepsi in the U.S. District Court for the District of Puerto Rico, bringing claims under the ADEA and Puerto Rico Law 100 on the basis of the allegation that the disparate treatment in the disciplinary measures imposed by Pepsi on Cordero and Alvarez was motivated by discriminatory age animus. A one-day jury trial was held on February 13, 1997. At the end of the plaintiff's case, Pepsi moved for a directed verdict, but the court denied the motion. On the following day, the jury returned a verdict for Alvarez on both claims, and in addition found that Pepsi had willfully violated the ADEA. The jury awarded Alvarez $73,373.39 in back pay, and $55,000 in compensatory damages.

On April 1, 1997, Pepsi filed a motion under Fed.R.Civ.P. 50 renewing its earlier motion for judgment as a matter of law, as well as a motion under Fed.R.Civ.P. 59(a) for new trial and to amend judgment. On July 25, 1997, the district court granted Pepsi's Rule 50 motion. On September 12, 1997, the court entered judgment in favor of Pepsi dismissing the complaint. Alvarez filed a timely notice of appeal on October 14, 1997.

## II. Jurisdiction and Standard of Review

■■■ We have jurisdiction over this appeal, which is from a final decision of the U.S. District Court for the District of Puerto Rico. *See* 28 U.S.C. 1291. We review *de novo* a district court's decision to grant a motion under Rule 50 for judgment as a matter of law. *See Speen v. Crown Clothing Corp.*, 102 F.3d 625, 628 (1st Cir.1996). When the court grants the motion and enters judgment for the movant notwithstanding the jury's verdict for the non-movant, we examine the evidence presented to the jury, and all reasonable inferences that may be drawn from such evidence, in the light most favorable to the jury verdict. *See Rolón–Alvarado v. Municipality of San Juan*, 1 F.3d 74, 76 (1st Cir.1993). In doing so, moreover, we may not take into consideration the credibility of witnesses, resolve conflicts in testimony, or in any other manner weigh the evidence. *See Katz v. City Metal Co.*, 87 F.3d 26, 28 (1st Cir.1996). We assume the veracity, however, of any admissions made and stipulations entered into by the party opposing the Rule 50 motion, *see* Fed.R.Civ.P. 36(b), as well as any evidence derived from disinterested witnesses that has not been contradicted or impeached. *See Collazo–Santiago v. Toyota Motor Corp.*, 149 F.3d 23, 27–28 (1st Cir.1998).

■■ On review, the question before us is whether there was sufficient evidence to allow a reasonable jury to find that the plain-

---

**2.** Pursuant to Pepsi's pension plan, Alvarez could not retire before his 55th birthday. If he either retired or was discharged before then, he would not begin receiving pension payments until his 62nd birthday.

**24**

tiff met his burden of proof under the ADEA and Puerto Rico Law 100. *See Acevedo–Díaz v. Aponte,* 1 F.3d 62, 66–67 (1st Cir. 1993). A non-moving party must submit more than a scintilla of evidence as to an issue on which it bears the burden of persuasion in order to resist or reverse the entry of judgment as a matter of law on that issue. *See Coyante v. Puerto Rico Ports Authority,* 105 F.3d 17, 21 (1st Cir.1997). Thus, in order to support a jury finding on such an issue, the evidence presented must make the existence of the fact to be inferred more probable than its nonexistence. *See Katz,* 87 F.3d at 28.

**III. Age Discrimination in Employment Act**

"The ADEA makes it unlawful for an employer to 'discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age.'" *Serrano–Cruz v. DFI Puerto Rico, Inc.,* 109 F.3d 23, 25 (1st Cir.1997) (quoting from text of the ADEA). In raising a disparate treatment claim under the ADEA, a plaintiff bears the burden of persuading the factfinder that, because of his age, he was treated less favorably than other persons who were similarly situated in all relevant respects. *See DiBiase v. Smith-Kline Beecham Corp.,* 48 F.3d 719, 726 (3d Cir.1995); *cf. Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 258, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (disparate treatment claim under Title VII); *Mack v. Great Atlantic and Pacific Tea Co.,* 871 F.2d 179, 182 (1st Cir.1989) (same).

When a plaintiff provides direct evidence of discrimination, the issue may be put to a finder of fact without further ado. However, when a plaintiff has not provided "direct evidence that the employer's actions were motivated by age, the familiar *McDonnell Douglas* framework governs" the order in which the evidence is presented. *Serrano–Cruz,* 109 F.3d at 25 (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)); *see also Kelley v. Airborne Freight Corp.,* 140 F.3d 335, 348 (1st Cir.1998). Under that framework, the employee must first "prov[e] by the preponderance of the evidence a prima facie case of discrimination." *Burdine,* 450 U.S. at 252–53, 101 S.Ct. 1089. In an ADEA case, the plaintiff must show "that: 1) he was at least 40 years old; 2) met the employer's legitimate job expectations; 3) was fired or constructively discharged; and 4) that age was not treated neutrally." *Ruiz v. Posadas de San Juan Associates,* 124 F.3d 243, 247–48 (1st Cir.1997).

"[I]f the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the" adverse employment action suffered by the employee. *Burdine,* 450 U.S. at 252–53, 101 S.Ct. 1089; *see also Kelley,* 140 F.3d at 348. To meet that burden, the defendant need only produce an explanation, and thus "need not persuade the court that it was actually motivated by the proffered reasons." *Burdine,* 450 U.S. at 254, 101 S.Ct. 1089.

A failure to comply with this easily-met requirement can be fatal, because defendant's "failure to introduce evidence of a nondiscriminatory reason will cause judgment to go against it unless the plaintiff's prima facie case is held to be inadequate in law or fails to convince the factfinder." *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 510 n. 3, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). If the defendant satisfies its burden of production, however, then "the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant." *Id.* at 510, 113 S.Ct. 2742. In such a situation, "[t]he plaintiff then has 'the full and fair opportunity to demonstrate,' through presentation of his own case and through examination of the defendant's witnesses, 'that the proffered reason was not the true reason for the employment decision,' ... and that [age] was." *Id.* at 507–08, 113 S.Ct. 2742 (quoting *Burdine,* 450 U.S. at 256, 101 S.Ct. 1089).

Although the plaintiff must then prove both that the defendant's explanation is false, and that the real reason behind the defendant's actions was discriminatory animus, it will not always be necessary for the plaintiff to present additional evidence of dis-

crimination beyond that necessary to prove that the proffered reasons are pretextual. As the Supreme Court has explained, "[t]he factfinder's disbelief of the reasons put forward by the defendant (particularly if the disbelief is accompanied by a suspicion of mendacity), *may*, together with the elements of the prima facie case, ... *permit* the trier of fact to *infer* the ultimate fact of intentional discrimination." *St. Mary's Honor Center*, 509 U.S. at 511, 113 S.Ct. 2742 (emphasis added); *see also Kelley*, 140 F.3d at 349. The reasonableness of the jury making such inference, however, is subject to review under Fed.R.Civ.P. 50, just as any other finding of fact.

■ Pepsi, for the sake of argument, chooses not to dispute that Alvarez established a prima facie case under the ADEA, and Alvarez does not dispute that Pepsi articulated a legitimate, non-discriminatory reason for the way it treated him. The only question before us is therefore whether a reasonable jury could have found that the reasons given by Pepsi were a sham, and that the actions taken by Pepsi with regard to Alvarez were motivated by discriminatory animus based on age. In this case, we believe that no reasonable jury could find that Pepsi's proffered explanation for its actions with regard to Alvarez was a pretext masking discriminatory animus.

Pepsi explained that it discharged Alvarez because he had violated its internal disciplinary rules, and that its decision to dismiss Alvarez was mandated by such rules. Alvarez contends, however, that this explanation is false. He argues that the pretextual character of Pepsi's explanation was shown by the fact that Cordero was suspended for only 30 days, as compared to the 60–day suspension and subsequent discharge imposed upon him. The evidence showed that Pepsi had established rules and regulations for the workplace that prohibited fighting and horseplay, among other things, and that any violation could render the employee subject to dismissal at Pepsi's discretion.

Alvarez is only partly correct. A jury could have disbelieved Pepsi's claim that its workplace rules required the dismissal of an employee who initiated a fight in all cases.

The rules themselves speak of Pepsi's discretion with regard to the sanctions that it could impose, which hardly supports the claim that dismissal was mandatory. Pepsi sought to explain the apparent inconsistency by arguing that, although the rules did not specify that dismissal was mandatory, as a matter of policy it would always dismiss employees who had initiated fights. However, this argument is undermined by the evidence that several years earlier, Alvarez had initiated a fight, and although he had been sanctioned, he had not been fired. There was more than enough evidence for the jury to find that it was within Pepsi's discretion whether or not to discharge an employee when that employee had initiated a fight in the workplace.

■ As a result of the inconsistencies in Pepsi's argument pointed out above, a reasonable jury could question Pepsi's credibility. There is, however, no direct evidence that Alvarez was *not* discharged because of the fight. Alvarez claims that the fact that he was initially only suspended, and only later offered early retirement (and ultimately discharged), indicates that the latter two decisions had nothing to do with the fight. This argument tests, and perhaps surpasses, the outer limits of the inferences that could permissibly be drawn from the facts. The fact that Pepsi's proffered explanation was not entirely consistent does not give a jury license to disbelieve all of the uncontradicted evidence indicating that Alvarez was discharged as a result of the fight.

■ But even assuming that a reasonable jury could find Pepsi's explanation to be pretextual, Alvarez failed to show that Pepsi discriminated against him because of his age. Alvarez makes much of the language from *St. Mary's Honor Center* stating that "[t]he factfinder's disbelief of the reasons put forward by the defendant (particularly if the disbelief is accompanied by a suspicion of mendacity), *may*, together with the elements of the prima facie case, ... *permit* the trier of fact to *infer* the ultimate fact of intentional discrimination." 509 U.S. at 511, 113 S.Ct. 2742 (emphasis added). However, not only is a jury not required to infer discrimination from a showing of pretext together with the evi-

dence underlying the prima facie case, but the facts will most often not permit a jury to do so. That is certainly the case here, where both the prima facie case and the showing of pretext are weak, and there is no independent evidence that would reasonably allow the inference that age discrimination was the motivation for Pepsi's actions.

With regard to the evidence underlying the prima facie case, there is no doubt that, at 54 years of age, Alvarez fell within the category of persons protected by the Act, and that he was subjected to adverse employment action, namely, suspension and termination. Pepsi contends that there is scant evidence to support a finding that Alvarez was performing his job adequately, noting that Alvarez did not delegate properly, and that he was rude and offensive to other workers. However, as the district court found, a reasonable jury could find for Alvarez on this point, given his 34 years of service with the company, as well as the raises, performance bonuses, and commendations that he received during that time.

The fourth and last prong of the prima facie case, however, presents a more difficult question. Undoubtedly, Pepsi treated Cordero, who was under 40 years of age, more leniently than it did Alvarez. The district court found, because the burden on Alvarez was exceedingly light, that he had proved this element of his prima facie case. Pepsi contends that the district court erred, because no reasonable jury could have found that Alvarez and Cordero were similarly situated.

We agree with Pepsi. We note here that Alvarez had the burden of proof on this issue, not merely a burden of production. As the Court explained in *St. Mary's Honor Center*, the defendant "feels the burden" to provide a legitimate, nondiscriminatory reason for its actions as soon as the plaintiff has presented some evidence to support his prima facie case. *See* 509 U.S. at 510 n. 3, 113 S.Ct. 2742. That does not mean, however, that the plaintiff need not *prove* his prima facie case. To the contrary, if the finder of

fact subsequently fails to be convinced by the evidence adduced by the plaintiff in support of his prima facie case, the burden of production is lifted from the defendant. *See id.*

The evidence presented at trial established that Alvarez initiated the fight, and, in any case, that he had been most at fault. Although he denies that he initiated the fight, he admits, inconsistently, that he threw a piece of cardboard at Cordero at the beginning of their argument, and that he later threw either a radio or a flashlight at Cordero's face. Alvarez also admits that he had problems controlling his anger, frequently used offensive language, often used physical force to maintain order among the workers that he supervised, and had been involved in at least two previous fights on the premises, albeit a long time before. In contrast, it was shown that Cordero had never been involved in a violent incident at work, that he had not initiated this particular fight, and that he was otherwise a well-behaved employee. This evidence undermines any argument that Alvarez and Cordero were similarly situated for purposes of the sanctions imposed upon them by Pepsi. *Cf. Perkins v. Brigham & Women's Hosp.*, 78 F.3d 747, 751 (1st Cir.1996) (disparate treatment claim under Title VII). Consequently, there is no support for the conclusion that age was not treated neutrally by Pepsi in deciding to impose sanctions of different severity upon Cordero and Alvarez.

Moreover, at this stage of the *McDonnell Douglas* analysis it is irrelevant whether or not the facts in question sufficed to establish a prima facie case or not. Instead, the question is whether the whole of the evidence mustered by the plaintiff, regardless of whether it was initially presented to establish the prima facie case or to show pretext, suffices to allow a finding that the defendant intentionally discriminated against him. *See Sánchez v. Puerto Rico Oil Co.*, 37 F.3d 712, 720 (1st Cir.1994). We find that, even if the evidence described above were sufficient to establish the fourth and final requirement of the prima facie case, this evidence would still not be probative of discriminatory intent.[3]

---

**3.** Thus, Pepsi's argument that the evidence underlying the prima facie case does not permit a

finding of discriminatory animus is not inconsistent with its decision not to dispute the allegation

■ Nor is there evidence that could independently support a finding that Pepsi discriminated against Alvarez because of his age. Cordero did tell Alvarez that he was senile, but, aside from the fact that he said that in the context of an altercation with Alvarez, it was shown that Cordero had no authority to influence Pepsi's decision to discharge Alvarez.

■ As for the offer of early retirement, we note that such an offer is not, by itself, evidence of constructive discharge or discriminatory animus. *See Vega v. Kodak Caribbean, Ltd.*, 3 F.3d 476, 479 (1st Cir.1993); *Hebert v. Mohawk Rubber Co.*, 872 F.2d 1104, 1110–11 (1st Cir.1989); *Gray v. New England Telephone and Telegraph Co.*, 792 F.2d 251, 255 (1st Cir.1986). Something more must be shown that would tie the decision to offer early retirement to discrimination.

■ The evidence here, however, suggests only that Pepsi had decided to terminate Alvarez, but because of his many years of service, sought to find a way to soften the economic impact of that decision. As we indicated above in the background section, Pepsi began paying Alvarez's salary after his suspension ended, even though he was not working at the time, and offered to continue doing so until the end of the calendar year, even after he had retired and begun to receive his pension payments. Pepsi also suggested that Alvarez wait until May 15, 1994, the date of his 55th birthday, so that he could qualify for his full pension. The uncontro-

verted evidence indicated that, had Pepsi fired Alvarez before May 15, 1994, he would not have been eligible for a full pension until he reached his 62nd birthday, seven years later. In view of this evidence, we find that no reasonable jury could find that Pepsi's offer of early retirement is evidence of discriminatory animus. We therefore conclude that the district court did not err in dismissing with prejudice Alvarez's ADEA claim.

## IV. Puerto Rico Law 100

■ Puerto Rico Law 100, like the ADEA, "provides a cause[ ] of action in favor of those persons who suffer discrimination in their employment because of their age. However, [the statutes] differ with regard to the burden[s] of proof that they impose upon the employer and the employee," under certain circumstances. *Soto v. Hotel Caribe Hilton*, No. RE–93–603, —— P.R. Dec. ——, ——, 1994 WL 909663, at 4 (Oct. 17, 1994).[4] In particular, Law 100 establishes a rebuttable presumption that the employer has discriminated illegally unless the employer can show that the discharge was justified. *See* P.R. Laws Ann. tit. 29, § 148.[5]

■ The most important difference between Law 100 and the ADEA is that when the Law 100 presumption has been triggered, it shifts not only the burden of production, but also the burden of persuasion, from the employee to the employer. *See Ibañez–Benítez v. Molinos de Puerto Rico, Inc.*, 114 P.R. Dec. 42, 52 (1983).[6] Thus, in order to rebut the Law 100 presumption, the employer must

that Alvarez successfully established a prima facie case.

4. Section 1 of Law 100 provides, in pertinent part:

Any employer who discharges, lays off or discriminates against an employee regarding his salary, wage, pay or remuneration, terms, rank, conditions, or privileges of his work, ... on the basis of age, as defined hereafter, .... shall incur civil liability ... [and] he shall also be guilty of a misdemeanor.

P.R. Laws Ann. tit. 29, § 146 (Official translation 1985).

5. Section 3 of Law 100 provides:

Any of the acts mentioned [in section 146] shall be presumed to have been committed in

violation [of this law], whenever the same shall have been performed without good cause. This presumption shall be of a controvertible character.

P.R. Laws Ann. tit. 29, § 148 (Official translation 1985).

6. The difference between the two statutes might be almost entirely due to the difference between the Federal Rules of Evidence and the Puerto Rico Rules of Evidence with regard to the effect of legal presumptions upon the parties' relative burdens of proof. *Compare St. Mary's Honor Center*, 509 U.S. at 506, 113 S.Ct. 2742 (relying on Fed.R.Evid. 301, which provides that legal presumptions shift burden of going forward but not burden of persuasion), *with Ibañez–Benítez*, 114 P.R. Dec. at 51–52 (relying on P.R. R. Evid. 14, which provides that legal presumptions shift burden of persuasion).

prove, by a preponderance of the evidence, that the challenged action was not motivated by discriminatory age animus. *See id.* at 53.

As noted above, *see supra* note 5, the Law 100 presumption of discrimination is triggered when it is shown that the employer lacked "just cause" to discharge or take other adverse action with regard to the employee. In *Báez García v. Cooper Laboratories, Inc.*, 120 P.R. Dec. 145, 155 (1987), the Supreme Court of the Commonwealth of Puerto Rico determined that, because Law 100 did not define the term "just cause," the term's definition would be sought in an analogous statute—the Puerto Rico Law on Unjustified Dismissals, Law 80 of May 30, 1976, P.R. Laws Ann. tit. 29, §§ 185a–185k. Law 80 defines a dismissal without just cause as a dismissal based on a reason not allowed by the statute.[7] The statute allows dismissals for a number of reasons, including an employee's improper or disorderly conduct, negligent attitude towards his work, and violations of the employer's rules and regulations. *See* P.R. Laws Ann. tit. 29, § 185b. However, "[a] discharge made by mere whim or fancy of the employer or without cause related to the proper and normal operation of the establishment shall not be considered as a discharge for [just] cause." *Id.* (Official translation 1985). Once the plaintiff has proven that he was directly or constructively discharged, Law 80 shifts the burden of proof to the employer to show that the discharge was justified. *See* P.R. Laws Ann. tit. 29, § 185k; *see also Báez García*, 120 P.R. Dec. at 152.[8]

It follows that the Law 100 presumption that a dismissal was discriminatory depends on the Law 80 presumption that the dismissal was unjustified. Stated more explicitly, the Law 80 presumption is triggered when the plaintiff alleges unjustified dismissal and proves by a preponderance of the evidence that he was actually or constructively discharged. The burden then shifts to the employer to prove by a preponderance of the evidence that it had just cause to dismiss the employee. If the employer fails to make this showing, the Law 100 presumption of discrimination is triggered, shifting the burden to the employer of proving by a preponderance of the evidence that the otherwise-unjustified dismissal was not motivated by discriminatory animus.

Conversely, if the employer proves that the discharge was justified, then the Law 100 presumption disappears. *See* P.R. Laws Ann. tit. 29, § 148. Consequently, the burden of proof on the ultimate issue of discrimination remains with the plaintiff, as in any other civil case. The plaintiff must prove that, even if the dismissal was justified, the defendant nevertheless violated Law 100 because the dismissal was motivated by discriminatory animus instead of or in addition to the legitimate reasons for dismissal. The Law 100 plaintiff is then in same situation as an ADEA plaintiff after the defendant has articulated a legitimate, non-discriminatory reason for its actions.

This is such a case, because the evidence presented at trial would not permit a reasonable jury to find that Pepsi had failed to meet its burden under Law 80 of proving that Alvarez's discharge was justified. The evidence is clear. Pepsi had established rules and regulations for the workplace that prohibited fighting and horseplay, and specifically warned employees that any violation of such rule could render the employee subject to dismissal at Pepsi's discretion. Alvarez admitted that he was aware of that rule, including the fact that dismissal was a possible sanction for a violation of the rule. It is not disputed that Alvarez was involved in the fight, and, although he denies it, there is overwhelming evidence that he instigated the fight with Cordero, and not the other way around. It is also undisputed that Alvarez had been previously involved in other fights, and had been warned in writing that any further violations would entail his dismissal.

---

7. Law 80 defines a discharge as, "in addition to the employee's layoff, his suspension indefinitely or for a term over three (3) months...." P.R. Laws Ann. tit. 29, § 185e.

8. The Puerto Rico Supreme Court has noted that Law 100 does not require the employer to articulate a non-discriminatory reason for its actions, "although in practice this would be the most certain and convenient way of destroying the presumption." *Ibañez–Benítez*, 114 P.R. Dec. at 53.

Alvarez also admitted that he used offensive language and physical force on numerous occasions in the workplace.

Given this evidence, no reasonable jury could have failed to find that Pepsi had just cause to dismiss Alvarez, regardless of the allocation of the burden of persuasion. Furthermore, as we have discussed above with regard to his ADEA claim, no reasonable jury could have found that Alvarez carried his burden of proof on the ultimate issue of discrimination. We therefore conclude that the district court did not err in dismissing with prejudice Alvarez's Law 100 claim.[9]

## V. Conclusion

For the reasons discussed above, we *affirm* the judgment of the district court.

---

**9.** In dismissing the Law 100 claim, the district court stated that "[a]lthough Alvarez's claim also was brought under Law 100, since Alvarez cannot prevail on his ADEA claim, he likewise cannot prevail on his state law claim." Insofar as this statement could be taken to mean that dismissal of the Law 100 claim follows as a matter of law from the dismissal of the ADEA claim, the statement would be incorrect. The difference between the burdens of proof placed upon plaintiffs and defendants by Law 100 and the ADEA can be outcome-determinative in some cases. However, it is not clear that the district court meant anything other than that, in this case, the plaintiff failed to meet his burden for the reasons we have explained above. Either way, we may affirm the judgment of a district court on any independently sufficient ground. *See Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 173 (1st Cir.1998) ("We will affirm a correct result reached by the court below on any independently sufficient ground made manifest by the record.") (citations omitted).